**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**VERA D. MOSS, BARBARA J. NORTON, AND**          **CIVIL ACTION**
**PAMELA R. BELL,**

**VERSUS**                                        **NO. 04-3090**

**WAL-MART STORES, INC. AND**                     **SECTION: "C"**
**WAL-MART ASSOCIATES, INC.**

<u>**ORDER AND REASONS**</u>[1]

Before this Court is a Motion for Summary Judgment to dismiss the claims of plaintiffs

Vera D. Moss ("Moss"), Barbara J. Norton ("Norton"), and Pamela R. Bell (**"Bell"**) **(**collectively

"plaintiffs") filed by the defendants, Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc.

(collectively "Wal-Mart" and "defendants").  (Rec. Doc. 69).  The plaintiffs oppose the motion.

The motion is before the Court on briefs, without oral argument.  Having considered the

memoranda of counsel, the record and the applicable law, the Court finds that Wal-Mart's

motion is **DENIED**.

---

[1] Elizabeth A. Chickering, a third year student at Tulane Law School, assisted in the research and preparation of this decision.

1

## I.      Background

This case concerns plaintiffs' allegations of sexual harassment and retaliation by their

former employer in violation of state and federal law.  Wal-Mart hired plaintiffs Moss and

Norton in January 2001, and plaintiff Bell in January 2003, to work as Loss Prevention ("LP")

Associates at its Distribution Center in Robert, Louisiana ("D.C. 6057").  Penazer Hughes

("Hughes") joined the LP Department in March 2001 as an Assistant Coach and alleged LP

Supervisor.  Each plaintiff alleges that throughout their employment with Wal-Mart, they were

constantly subjected to separate acts of inappropriate sexual comments, gestures, and contact

from Hughes.  Wal-Mart contests most of plaintiffs' factual assertions.  The following is a

summary of plaintiffs' individual allegations.

### A.      Vera D. Moss

Moss alleges that Hughes began making unwelcome advances toward her in February

2002.  Moss alleges that Hughes (who is African American) suggested that Moss (who is

Caucasian) "try a brown banana sometime," as he alternatively looked at his crotch and at Moss,

made several other sexual comments, grabbed his crotch when he knew she could see him, and

made a point of needlessly brushing up against Moss's breasts and rubbing against her.  Moss

also alleges observing Hughes making similar sexual advances toward other female employees.

Moss viewed Hughes's actions as sexual harassment and allegedly told Hughes she disapproved

of his behavior, but she did not report his behavior to her superiors because she believed Wal-

Mart's Open Door policy was ineffective.

Moss further alleges that Hughes's lewd comments and gestures escalated to actual

2

demands for sexual intercourse under the threat of losing her job.  Moss allegedly first had

sexual relations with Hughes on May 13, 2002.  Moss alleges that she ultimately submitted to

Hughes's advances because she felt that no matter what she did, he was going to get what he

wanted.  Moss and Hughes allegedly engaged in twenty-nine acts of sexual intercourse between

May 2002 and August 20, 2003.  Moss alleges that throughout this time Hughes warned Moss to

keep their relations a secret and threatened that she would be fired and her family would be

homeless if she told anyone.  Moss ultimately told her husband Jeff about the sexual encounters

with Hughes, and when Hughes found out he allegedly told her to stay quiet or she would lose

her job.

 Vera and Jeff Moss allegedly considered reporting Hughes to Wal-Mart, but decided

against doing so for fear of Vera losing her job.  In 2001 Jeff was diagnosed with chronic

obstructive  pulmonary disease which prevented him from working, and Moss's wages from

Wal-Mart were her family's sole source of income.  Moss alleges that she attempted to tell both

Lemar Marshall ("Marshall"), the General Manager of D.C. 6057, and Don Wenzel ("Wenzel"),

LP Manager, about Hughes's actions, but Marshall allegedly responded by telling her that she

could be fired if those rumors were true and that what Hughes did outside of work was his

business, and Moss took this as a threat to keep quiet.  Moss approached Wenzel to discuss the

rumors going around D.C. 6057 about Hughes and her, but allegedly because she was nervous of

how Wenzel would respond, she told him that she "didn't do black."  Wenzel allegedly told her

that she could not say things like that and that he did not want to hear about any of it, then turned

his back and walked away.  On another occasion Wenzel allegedly told Moss that a lot of people

would like to have her job, so if she was unhappy, she should find something else to do.  At a July 29, 2003 LP Meeting, Moss joined Norton and Bell in complaining to Wenzel that Hughes did not treat female employees fairly.  Wenzel allegedly responded by calling the women liars, saying that Hughes was a good man, and that he did not want to hear what they had to say.

### B.    Barbara J. Norton

Norton alleges that Hughes began staring at her breasts around August 2002.  He also allegedly brushed up against her and frequently rubbed his groin in front of her.  On one occasion Hughes allegedly asked Norton how long her husband was keeping her up at night because she looked tired.  Hughes was aware that Norton was caring for her terminally ill husband, but she felt that his tone of voice and facial expression indicated that his comments were sexual rather than sympathetic.  On another occasion Norton asked Hughes if he would get up out of his chair so she could retrieve some paperwork from his desk, and Hughes allegedly looked down between his legs and replied, "You can sit here anytime you want."

Norton's husband passed away in January 2003, and when she returned to work Hughes allegedly asked her "how she was really doing" and said to let her know whether she "needed some company."  Norton responded to this commend by telling him, "I know you didn't just say that ... that's nasty."  Hughes also allegedly told her that he felt sorry for whomever she finally decided to have sex with.  On one occasion Hughes allegedly called Norton's cell phone outside of work to ask her where she was and what she was doing.  Another time Hughes allegedly approached Norton from behind while she was at her computer terminal and began rubbing her shoulders.  She asked him to stop immediately because his actions frightened her.  Norton also

allegedly observed Hughes making sexual comments to other co-workers, including Moss and Bell.

Norton went to Wenzel in June or July 2003 to report Hughes's actions and unfair treatment of women on his shift.  Norton alleges that she specifically told Wenzel that Hughes made inappropriate sexual comments, unnecessarily brushed up against her on several occasions, and that she was scared to be in the office with him.  Norton did not mention Hughes's actions toward the other women, but instead told Wenzel that he needed to speak to other women on the shift (which included Moss and Bell) because the "shift was just falling apart."  Norton alleges that there is no evidence that Wenzel talked to either Moss or Bell, nor took any steps to investigate Norton's complaint.  Norton again addressed her concerns to Wenzel at the July 29, 2003 LP Meeting along with Moss and Bell, complaining that Hughes demanded more of the women on the shift than the only male, Larry Dotey ("Dotey"), who also spoke up and confirmed Hughes's disparate treatment of the women on the shift.  Wenzel allegedly responded by telling them he thought they were lying and "just mad."

Norton also alleges that she asked Wenzel at the July 29 meeting whether he had spoken to Hughes about her earlier complaints, and Wenzel told Norton that he would speak to her privately after the meeting.  When Norton arrived for their meeting, Hughes was in Wenzel's office and Norton did not feel comfortable discussing Hughes's behavior in his presence. Wenzel then allegedly asked Norton whether she liked her job, and told her that the comments she made at the meeting could get her fired.  Norton starting crying and left the meeting, and afterwards Norton alleges Wenzel would not look at or speak to her.

### C.     Pamela R. Bell

Bell alleges that the first incident of sexual harassment by Hughes occurred in March 2002 when Hughes placed truck keys in her hand and made a circular motion with his finger on her hand.  Bell claims that because of the way Hughes touched her and the look on his face, she felt he was making a sexual advance.  Bell also alleges that in February 2003 Hughes inappropriately commented on the size of Bell's breasts in front of another male co-worker, Terry May.  Hughes later allegedly touched Bell's breasts while hugging her from behind.  On another occasion, Hughes also allegedly made exaggerated humping and gyrating motions with his hips and groin when Bell passed by his desk.  Bell alleges that she did not report these incidents through Wal-Mart's Open Door policy because the last time she used the policy she received a negative evaluation.

In June 2003 while Bell was in the LP office bending over to get something out of a filing cabinet, Hughes allegedly told her to get up because her "stuff" was showing.  Bell was not sure what he meant by that statement, but she felt his comment was sexual in nature and intended to make her uncomfortable.  This incident lead Bell to report Hughes's sexual actions to General Manager Marshall.  Marshall allegedly responded to Bell's complaints by telling her that she needed to maintain a working relationship with Hughes.  He also allegedly reprimanded Bell for her attendance record and told her that she needed to stop missing work.  Bell also joined Moss and Norton in their complaints at the LP Meeting on July 29, 2003.

### D.     EEOC Complaint and Wal-Mart's Alleged Retaliation

Moss, Norton and Bell jointly filed a complaint with the Equal Employment Opportunity

6

Commission ("EEOC") in November 2003.  Wal-Mart had notice of plaintiffs' EEOC charge by the end of November 2003.  After learning of plaintiffs' EEOC filings Wal-Mart immediately appointed Eric Allen ("Allen") to replace Hughes and initiated an internal investigation into the complaints.  On December 20, 2003 Assistant Manager Ronnie Erwin ("Erwin") called Moss and Norton into his office separately to meet with him and Kay Dasher ("Dasher"), the Human Resources Manager at D.C. 6057.  Erwin and Dasher told Moss that Tim Sanders ("Sanders") had reported seeing Moss clock-in Norton on the previous Sunday, December 14, 2003, and that the event was recorded on camera.  Moss told Dasher that she had not clocked Norton in and would never have done so, but allegedly after Dasher repeatedly insisted that the incident was recorded, Moss said she could not remember, was confused, and could not think straight.  Dasher then allegedly told Moss that the punishment for clocking someone in was termination, but that Moss should "trust [her], it would be all right."  Moss stated that Norton had never given Moss her badge, and that Norton had clocked in right after Moss that day, but after Dasher reminded her that Sanders had submitted a statement, Moss allegedly became scared and told Erwin and Dasher what she thought they wanted to hear.  She stated that "she must have done it, because of the evidence they said they had."  Dasher again told Moss that "everything would be alright," so Moss wrote a statement apologizing for the incident and admitting her guilt, though she allegedly did not remember "do[ing] such a thing."  Before allowing Moss to leave, Erwin and Dasher instructed her not to speak to any other Wal-Mart associates about the investigation.

Erwin and Dasher later met with Norton and told her they had a witness and a video recording confirming that Moss clocked Norton in the previous Sunday, and that Moss had

confessed to doing so.  Norton denied the allegations and wrote a statement stating that she did not give her badge to Moss and that Moss did not clock her in.  Erwin and Dasher allegedly asked Norton to rewrite the statement to say that she did not remember, but Norton refused. Erwin and Dasher called Moss and Norton in and out of their office all day until Norton insisted on going home at 5:00 pm.  When Moss returned home that evening she allegedly realized that she had been manipulated into giving Erwin and Dasher a false confession.  She immediately wrote a letter recanting her confession which her husband delivered to Norton and D.C. 6057 the next day.  Norton also called Sanders that evening to ask him about his statement because she felt that Wal-Mart was trying to fire her.  Sanders allegedly told Norton that he never told management that he had seen Moss clock her in.  The next day Norton obtained a written statement from Sanders saying that he never saw Moss with Norton's badge.

On December 26, 2003 Norton again met with Dasher and Marshall.  Marshall allegedly told Norton she was fired because she had spoken to Sanders.  Norton showed Marshall Moss's letter recanting her previous admission of guilt, and Marshall allegedly accused Norton of having a relationship with Moss's husband after Norton said that Moss's husband Jeff dropped the letter off at her house.  When Moss returned to work on December 27, Marshall called her into his office and told her that she was "stepped" in her discipline matrix.  He allegedly told her that he did not believe her letter, but admitted that she had not defrauded the company because Norton had been on time for work on December 14, 2003.  When Moss returned to work after the meeting, Bell ask Moss how things were going and Moss allegedly responded that she could not talk about it.  Moss was later called in to Marshall's office and chastised for speaking to Bell

about the ongoing investigation.  Moss was called into Marshall's office again later that day where she was allegedly interrogated about the copy of her letter that was delivered to Norton's home by her husband Jeff.  Moss also alleges that Dasher and Marshall also asked her several personal questions regarding her relationship with her husband and accused Moss's husband and having an affair with Norton.  Moss was called in and out of meetings with Marshall all day, where Marshall allegedly told her that he was willing to fire her, but that he had to check with Wal-Mart attorneys.

On December 31, 2003 Marshall told Moss and Norton in separate meetings that each was terminated, not for the alleged clocking-in incident, but for talking to a witness after they were asked not to.  Marshall allegedly told Norton that she was being terminated for trying to influence the outcome of the investigation, and told Moss that she was being terminated for insubordination.  Marshall allegedly acknowledged that Norton had not tried to cheat the company out of time, and that he would not terminate her if it was up to him, but that Wal-Mart's attorneys told him that he had to let her go.

Additionally, Wal-Mart allegedly allowed Hughes to prepare Bell's year-end evaluation despite the fact that Allen had replaced Hughes as Bell's supervisor when the evaluation was made.  Hughes rated Bell as "below expectations" on four out of five categories.  Bell also alleges that Wenzel and Marshall ignored and refused to speak to Bell from the time Wal-Mart learned of the EEOC filing in November 2003 until her resignation almost six months later, in direct violation of Wal-Mart's policy requiring all employees speak to one another when they come within ten feet of each other.  Bell alleges that other Wal-Mart supervisors openly

expressed support for Hughes in front of Bell, while shunning her and singling her out from her co-workers.  On one occasion Wenzel allegedly gave every employee except Bell a Wal-Mart hat signifying LP employees.  Bells also alleges that in March 2004 supervisors sought out each LP employee, offering additional hours, but no one extended the offer to Bell.  Finally on May 14, 2004, allegedly because of this constant isolation and estrangement, Bell could no longer tolerate the hostile environment and she resigned.

## II.      Standard of Review

Summary judgment is only proper when the record indicates that there is not a "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  A genuine issue of fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 247-48 (1986); see also *Taita Chem. Co. v. Westlake Styrene Corp.*, 246 F.3d 377, 385 (5th Cir. 2001).  When considering a motion for summary judgment, this Court "will review the facts drawing all inferences most favorable to the party opposing the motion."  *Reid v. State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir. 1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, however, "the burden shifts to the non-moving party to produce evidence or designate specific facts showing

10

the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).  In order to satisfy its burden, the non-moving party must put forth competent evidence and cannot rely on "unsubstantiated assertions" and "conclusory allegations."  *See Hopper v. Frank*, 16 F.3d 92 (5th Cir. 1994); *Lujan v. Nat'l. Wildlife Fed'n.*, 497 U.S. 871, 871-73 (1990); *Donaghey v. Ocean Drilling & Exploration Co.,* 974 F.2d 646, 649 (5th Cir. 1992).

### III.    Analysis

Wal-Mart argues that it is entitled to summary judgment on plaintiffs' Title VII sexual harassment and retaliation claims.  Wal-Mart contends that this is a case of alleged co-worker harassment because Hughes is not a "supervisor" as contemplated for a Title VII.  Under the standards for co-worker harassment cases, plaintiffs Norton and Bell cannot prove that the alleged harassment affected a term, condition or privilege of their employment, and none of the plaintiffs can prove that Wal-Mart knew or should have known of the alleged harassment and failed to take prompt remedial action.  Additionally, even if the Court finds that Hughes was a supervisor, Wal-Mart argues that summary judgment is still proper because plaintiffs cannot prove they suffered any tangible employment actions as a result of the alleged harassment, or that the harassment was severe or pervasive as a matter of law.  Wal-Mart further argues that it has an affirmative defense to any harassment claims because it  took steps to prevent harassment, plaintiffs delayed in reporting the harassment, and upon learning of the complaints, Wal-Mart took prompt and effective action to end the harassment.

Plaintiffs argue that issues of material fact preclude summary judgment on their sexual harassment claims.  Plaintiffs argue that Hughes was the "supervisor" of plaintiffs, and even if the Court finds that Hughes was a co-worker, issues of material fact as to Wal-Mart's knowledge of the harassment and its alleged remedial actions should preclude summary judgment.  Plaintiffs also argue that plaintiffs Norton and Bell created a genuine issue of material fact as to their hostile work environment claims because the harassment was severe and pervasive, created a hostile work environment, and undermined plaintiffs' work performance and competence. Plaintiffs further argue that Wal-Mart cannot satisfy the requisites for the affirmative defense because Wal-Mart failed to promptly correct the sexually harassing behavior and plaintiffs did not unreasonably fail to use Wal-Mart's complaint procedures.

There are at least two major categories of Title VII sexual harassment cases: (1) where the harasser is a supervisor or otherwise superior to the complainant in the corporate structure, and (2) where the harasser is a co-worker.  *Indest v. Freeman Decorating, Inc.*, 168 F.3d 795, 799 n. 20 (5th Cir. 1999). Employer liability for supervisor sexual harassment claims under Title VII is controlled by the standards set out in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998), while co-worker sexual harassment claims are analyzed under a two-part common law test.

Many of the factual issues that would be relevant in determining liability under both the supervisor and co-worker frameworks are in dispute.  First and foremost, plaintiffs and defendant disagree as to whether Hughes, the alleged harasser, is plaintiffs' supervisor or co-worker. Neither Title VII nor *Ellerth* or *Faragher* defines "supervisor;" however, courts and the EEOC

12

have identified several factors that tend to argue in favor of finding an employee to be a "supervisor" for Title VII purposes. As both parties point out, the court in *EEOC v. Laroy Thomas, Inc.*, 2006 WL 1984437 *17 (E.D.Tex. 2006), held that in order to be considered a "supervisor," the employee must be placed in a "position of superior authority" and "possess some significant degree of control over the hiring, firing, demotion, promotion, transfer, or discipline of subordinates." However, the court also held that the authority "need not be plenary or absolute," but it must encompass "the power to initiate, *recommend*, or effect tangible employment actions". *Id.* (emphasis added).

Defendants argue that because Hughes had no authority to hire, terminate, demote, transfer, set rates of pay, give pay increases or decreases, or approve of leaves of absences, among other things, he is not considered a "supervisor" under the *Faragher/Ellerth* framework. However, plaintiffs argue Hughes should be considered a supervisor under Title VII because he testified in his deposition that he was a supervisor of loss prevention, Wal-Mart admitted in its Answer that Hughes had supervisory duties, Hughes evaluated job performances of all the plaintiffs and signed their evaluation forms under the title "Supervisor/Area Manager," he took "supervisor notes" of all the associates he supervised, and he was honored with "supervisor of the year" during his first year at D.C. 6057.

As plaintiffs point out, in *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 411 (5th Cir. 2002), the Fifth Circuit held that an employee was a supervisor based solely on the alleged harasser's deposition testimony and the defendant's Answer. While the present situation does

13

not present as strong a case as *Wyatt*,[2] taken in the light most favorable to the plaintiffs, the

Court finds that plaintiffs have created a genuine issue of material fact as to whether Hughes was

plaintiffs' supervisor or co-worker.  For the purposes of this motion, the Court will address the

relevant analyses under both situations, supervisor and co-worker.

A.    **Supervisor Sexual Harassment**

The Fifth Circuit has outlined the established methodology for analyzing supervisor

sexual harassment claims:

> First we determine whether the complaining employee has suffered a "tangible
> employment action."  If he has, the claim is classified as a "quid pro quo" case; if he has
> not, the claim is classified as a "hostile environment" case.  In a quid pro quo suit, proof
> that a tangible employment action resulted from a supervisor's sexual harassment renders
> the employer vicariously liable, and no affirmative defense can be asserted.  In a hostile
> environment case, however, the next inquiry is whether the supervisor's actions
> constituted severe or pervasive sexual harassment: If the conduct was not severe or
> pervasive, the employer cannot be held vicariously liable for the supervisor's actions; if
> the conduct was severe and pervasive, the employer is vicariously liable unless the
> employer can establish both prongs of the conjunctive *Ellerth/Faragher* affirmative
> defense - the only affirmative defense available to vicariously liability in a supervisor
> sexual harassment hostile work environment case.  To establish this defense, the
> employer must show that (1) the employer exercised reasonable care to prevent and
> correct promptly any sexual harassment, *and* (2) the complaining employee unreasonably
> failed to take advantage of any preventative or corrective opportunities provided by the
> employer.

*Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002) (internal citations omitted);

---

[2]In *Wyatt*, the alleged harasser described himself as a "supervisor" who supervised the
plaintiff's daily activities in his deposition testimony.  In addition, and more legally
determinative, the plaintiff's complaint stated that the alleged harasser was plaintiff's
"immediate supervisor."  In its answer, the defendant stated that "[defendant] admits that from
the time she was employed until approximately November 14, 1994, [plaintiff's] immediate
supervisor was [the alleged harasser]."  *Wyatt,* 297 F.3d at 411-12.

*see also Casiano v. AT&T Corp.,* 213 F.3d 278 (5th Cir. 1999) (providing a "roadmap" for analysis of supervisor sexual harassment claims).

### 1.      Tangible Employment Action

The first question under the supervisor analysis is whether plaintiffs suffered a tangible adverse employment action.  It is undisputed that Hughes did not have the power to unilaterally terminate any of the plaintiffs, nor did he participate in any of the proceedings that led to plaintiffs Norton and Bell's eventual discharge.  Norton and Moss were both eventually discharged, which is a tangible employment action; however, plaintiffs contend that their discharge was in retaliation to their EEOC claims, and not a direct result of Hughes's alleged harassment.  Plaintiff Bell also claims that Wal-Mart's actions constituted retaliatory adverse employment actions.  Because plaintiffs do not claim that their alleged harasser directly caused their tangible employment actions, their claims will be classified as "hostile environment" claims for the purposes of the Title VII framework.

### 2.      Hostile Work Environment

The second question under the *Ellerth/Faragher* framework is whether the supervisor's conduct was severe and pervasive.  For an atmosphere of harassment or hostility to be actionable, the offending behavior must be sufficiently severe or pervasive to alter the victim's employment conditions and create an abusive working environment.  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  Plaintiffs must prove that they subjectively perceived the environment to be abusive, and that a reasonable person would find the environment hostile. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21-22 (1993).  Determining whether an environment is

hostile or abusive requires looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether there is psychological harm; and whether it unreasonably interferes with an employees work performance. *Id.* at 23. This is not a mathematically precise test, and no single factor is determinative. *Id.* at 22-23.

Defendants contend that the instances of harassment alleged by plaintiffs Norton and Bell are insufficient to create the severe and hostile environment required for Title VII claims. In addition to numerous specific instances alleged and detailed in the background section above, Norton claims that Hughes harassed her throughout the time he was her supervisor, and Bell alleges that Hughes subjected her to a constant barrage of humiliating harassment. While unsubstantiated assertions and mere conclusory allegations are not competent summary judgment evidence, *Hugh Simons Group, PLC v. Motorola, Inc.*, 292 F.3d 466, 468 (5th Cir. 2002), the Court finds that plaintiffs' numerous and detailed outline of Hughes's alleged harassment is sufficient to create a genuine issue of material fact as to whether Hughes's actions created a hostile work environment.

### 3.    Affirmative Defense

Assuming for the purposes of this motion that Hughes's actions did create a hostile work environment, the issue now turns to whether defendants can avail themselves of the affirmative defense to liability. First, defendants must prove that Wal-Mart took reasonable care to prevent and promptly correct the alleged sexual harassment. Defendants presented detailed information on the programs and systems Wal-Mart had in place to prevent harassment in the workplace,

including the Open Door Policy that encourages employees to bring problems to the attention of their supervisors or any level of management; the Harassment and Other Inappropriate Conduct policy which prohibits harassment because of sex and provides ways to report harassment, including the Ethics Hotline; and the employee orientation program advising new employees of the Ethics Hotline during a computer-based learning course, posters and Wal-Mart's intranet.

Plaintiffs do not dispute that preventative measures existed.  Rather, plaintiffs argue that the system in place was not an effective mechanism for reporting and correcting sexual harassment complaints, and as such Wal-Mart failed to promptly correct the alleged harassment. Defendants contend that Wal-Mart took immediate corrective measures as soon as they learned of the alleged harassment.  Upon learning of plaintiffs' EEOC claims, Wal-Mart initiated an investigation into plaintiffs' charges and appointed Eric Allen to replace Hughes as plaintiffs' supervisor.  In response, plaintiffs state that Wal-Mart's policies did not operate effectively in practice.  Moss believed "what [she] saw and what [she] understood to be the rule were two different things."  These two statements, unsupported by examples or explanation, are the kind of unsubstantiated assertions that do not create a genuine issue of material fact.  Thus defendants prevail on the first prong of the *Ellerth/Faragher* affirmative defense.

The second prong of the defense requires the defendant prove that the plaintiffs unreasonably failed to use Wal-Mart's complaint procedures to avoid harm.  Plaintiffs must prove that they utilized the reasonable means available under the circumstances to avoid or minimize damages.  *Faragher*, 524 U.S. at 806.  While proof under this prong is not limited to showing an unreasonable failure to use complaint procedures, a demonstration of such failure

will generally suffice to satisfy the employer's burden under this defense. *Id.* at 807-08. However, courts have held that objective fears of significant retaliation for complaining may be a sufficient excuse for an employee's failure to complain. *Young v. R.R. Morrison  & Son, Inc.*, 159 F.Supp.2d 921 (N.D. Miss. 2000).

While the reasonableness of plaintiffs' actions is fact-specific, courts have looked at the length of time between when the harassment begins and when the victim comes forward as a factor in determining whether the victim's actions were reasonable.  For example, an employee was found to have unreasonably failed to take advantage of protective procedures because even though he suffered an alleged fifteen instances of harassment over a four-month period, he failed to come forward with his complaints until months later.  *Casiano v. AT&T Corp.*, 213 F.3d 278, 287 (5th Cir. 2000).  The plaintiff in *Casiano* did make earlier complaints to his supervisor, but he never mentioned the alleged sexual nature of his supervisor's comments, thus the court found those complaints insufficient remedial measures.  *See also Williams v. Administrative Review Board*, 376 F.3d 471, 479 (5th Cir. 2004) (finding that when the harassment began on February 6, 1996, waiting until one month later to file a harassment complaint was unreasonable).

In the present case, Bell and Norton allege Hughes first began harassing them in March and August, 2002, respectively.  Bell claims that she did not initially report Hughes's harassment because her previous experience with the Open Door policy allegedly resulted in a poor performance evaluation.  Bell eventually complained to Marshall in July 2003 regarding Hughes's comment about her "stuff" showing, and Marshall allegedly responded by telling her that she needed to "leave that mess alone" and maintain a working relationship with Hughes.

Bell claims this response led her to believe that complaining would not solve her problem.

Norton went to Wenzel in July 2003 and complained that Hughes was saying inappropriate things and that she was scared to be alone with him in the office.  She allegedly told him that Hughes made sexual comments and brushed up against her on various occasions. Norton claims that she did not say anything earlier because she had the feeling that if she complained, nothing would be done and she would suffer the consequences, based on things she had heard from persons in other Wal-Mart departments.  Norton also complained at the July 29 meeting that Hughes was treating the women on the shift unfairly, but she did not mention anything about the sexual harassment.  Wenzel allegedly responded by telling the women that they were just mad and that he did not believe them.

Taking these allegations as true, the Court finds that Bell and Norton have at least raised an issue as to whether their steps taken to stop the harassment were reasonable.  Both women attempted to raise their issues with management, and both were allegedly met with less-than-helpful responses.  Both women were also distrustful of the effectiveness of the Open Door policy, albeit for fairly unarticulated reasons.  Be that as it may, the Court finds that Bell and Norton have raised a genuine issue as to the reasonableness of their response to the harassment.

Moss alleges that Hughes first began making unwelcome advances in February 2002. Throughout their sexual relationship, Moss alleges that Hughes repeatedly told her that she could not tell anyone about their relationship or she would get fired.  The Court finds that these allegations are sufficient to establish a triable issue as to whether Moss's failure to complain was excused by this significant fear of retaliation.

The Court finds that all three plaintiffs have presented genuine issues of material fact as to all the elements of a supervisor sexual harassment claim under the *Ellerth/Faragher* framework, and that defendants have failed to prove an absence of genuine issues of fact as to their affirmative defense.  Thus defendants motion for summary judgment on plaintiffs' sexual harassment claims is denied.

### B.    Co-Worker Sexual Harassment

While the Court has found that plaintiffs presented sufficient evidence that Hughes was their supervisor for the purposes of defeating defendant's motion for summary judgment on that issue, the Court finds that an examination of the present situation under the co-worker analysis is necessary, in case the fact finder should later determine that Hughes was in fact plaintiffs' co-worker.   For cases involving sexual harassment by a co-worker, EEOC Guidelines state that "with respect to fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." 29 C.F.R. §1604.11(d); *see also Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999).  A plaintiff in a co-worker sexual harassment suit must prove that (1) they are a member of a protected group; (2) they were the victim of uninvited sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of their employment; and (5) the employer knew or should have known of the harassment and failed to take remedial actions.  *Harville v. Westward Communications, LLC*, 433 F.3d 428, 434 (5th Cir. 2005).

Defendants to not dispute that plaintiffs' allegations satisfy  the first three requirements for summary judgment purposes.  However, defendants argue that plaintiffs cannot demonstrate that the alleged harassment affected a term, condition, or privilege of their employment, or that Wal-Mart either knew or should have known of the alleged harassment and failed to take prompt remedial action.  As for the effect of the alleged harassment on plaintiffs' working environment, the Court finds that all the evidence plaintiffs presented in support of a finding of a hostile work environment outlined above, *supra* Sec. A(2), is sufficient to create a genuine issue of material fact as to whether the alleged harassment affected a term, condition, or privilege of their employment, and does not need to be restated here.

In terms of the knowledge requirement, an employer is considered to have actual knowledge of any harassment that is known to higher management or someone who has the power to take action to remedy the problem. *Sharp*, 164 F.3d at 929.  The employer may also be liable for constructive knowledge of the harassment if, through the exercise of reasonable care, the employer should have known what was going on, but failed to address the problem. *Id*. at 930. Whether an employer should be charged with constructive knowledge is a question of fact. *Id*.

Defendants contend that no one with remedial power over Hughes had any knowledge of the alleged harassment until Wal-Mart learned of plaintiffs' EEOC charges in late November 2003.  Plaintiffs argue that Moss, Bell and Norton each tried to speak to members of management.  Specifically, Bell complained to Marshall in July 2003 regarding Hughes's comment about her "stuff" hanging out, Norton complained to Wenzel that same month about

21

Hughes's inappropriate sexual comments and how they scared her, and Moss attempted to bring

up the issue of her sexual relationship with Hughes with Marshall.  The Court finds these

allegations sufficient to create a genuine issue as to whether Wal-Mart was aware, or should

have been aware, of the harassment.

Additionally, there is no evidence that any remedial measures were taken until after Wal-

Mart learned of plaintiffs' EEOC charges.  The Court concludes that because plaintiffs have

presented evidence that could lead a reasonable jury to find that Wal-Mart had knowledge, either

actual or constructive, of harassment before the filing of the EEOC charge, and because there is

no evidence that defendant took any remedial measures prior to notice of that charge, plaintiffs

have presented sufficient evidence to defeat a motion for summary judgment on the issue of co-

worker harassment.

### C.     Plaintiffs' Retaliation Claims

In order to prevail in a Title VII retaliation claim, plaintiffs must prove that they (1)

engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a

causal connection between the participation in the protected activity and the adverse employment

action.  *Gee v. Principi*, 289 F.3d 342, 345 (5th Cir. 2002).  For the purposes of this motion,

defendants concede that Moss and Norton have made this *prima facie* showing.  (Rec.Doc. 69-2

n. 112)  The burden now rests on defendants to demonstrate a legitimate, nondiscriminatory

purpose for the employment action.  *Id.*  If the defendant satisfies this burden, the plaintiff must

prove that the stated reason was merely pretext for the real, discriminatory purpose.  *Id.*  The

question on summary judgment is whether the plaintiff has produced enough evidence of pretext

to support a finding that he or she would not have been fired in the absence of engaging in the protected conduct.  *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999).

Wal-Mart contends that Moss and Norton were discharged because (1) it appeared that Moss and Norton violated Wal-Mart's policies by Moss clocking Norton in; (2) Norton interfered with an on-going investigation by contacting witnesses after she was told not to do so; and (3) Moss provided a false statement during the investigation.

Plaintiffs offer several arguments as to why these alleged reasons for Moss and Norton's discharge are merely pretext.  First, plaintiffs argue that the timing of their EEOC claims and their discharge suggests pretext.  Wal-Mart learned of plaintiffs' EEOC charges in late November 2003, and Moss and Norton were termination on December 31, approximately one month later.  Additionally, plaintiffs argue that Dasher and Marshall, two of the principal actors in the termination decision, refused to speak to Moss and Norton after learning of the EEOC charge; defendants have been inconsistent as to the reasons for Moss and Norton's termination; Hughes was involved in reporting the alleged card swiping incident; and other employees, including Hughes, received much lesser punishments for allegedly worse violations of Wal-Mart policy.

While suspicious timing alone is not enough to prove pretext, the combination of proximate timing with other significant evidence of pretext can be sufficient to survive summary judgment.  *Shackelford*, 190 F.3d at 409.  In addition to plaintiffs' list of suspicious circumstances surrounding Moss and Norton's terminations listed above, there is a factual dispute over whether the alleged clocking-in incident – which forms the basis for Wal-Mart's

23

reasons for termination – ever actually happened.  Both Moss and Norton argue that Moss never swiped Norton's card.  Moss claims she was essentially coerced into writing her original statement admitting guilt by false promises that everything would be all right.  Both plaintiffs argue that the supposed videotape of the incident does not exist, and that Wal-Mart's eyewitness Tim Sanders denies he ever saw Moss swipe Norton's card.  Norton also argues that Marshall acknowledged that she had not tried to cheat the company out of time.

This evidence, when viewed in its totality and in the light most favorable to the plaintiffs, could support a reasonable finding that the clocking-in incident never actually occurred and as such, Wal-Mart merely made up that situation as pretext for terminating Moss and Norton for their EEOC charges.  This evidence is sufficient to create a genuine issue of material fact as to whether Wal-Mart terminated Moss and Norton in retaliation for activities protected by Title VII.    Plaintiff Bell was not terminated in the same manner as Moss and Norton; she voluntarily left her employment with Wal-Mart.  However, Bell argues that Wal-Mart's actions against her were materially adverse such that they would dissuade a reasonable worker from making or supporting a charge of discrimination.  Title VII's anti-retaliation provision is not limited ultimate employment actions; the plain language of the statute requires a broader reading that makes actionable any adverse treatment based on retaliatory motive.  *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405, 2413-14 (2006).  A plaintiff must demonstrate that the actions were the sort that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.*  Plaintiffs must prove that a reasonable employee would have found the employer's actions to be materially adverse – an objective standard meant

to separate significant from trivial harms.  *Id.* at 2415.  While objective, the significance of any

retaliatory act will usually depend on the particular circumstances and context.  *Id.*[3]

Bell argues that she suffered an adverse employment action for several reasons.  Bell

alleges that Wal-Mart allowed Hughes, her alleged harasser, to prepare her year-end evaluation

despite the fact that he was no longer her supervisor, and he rated her "below expectations" in

four out of five categories; Wenzel and Marshall avoided speaking to her  from the time of her

EEOC complaint to her resignation; Wal-Mart supervisors expressed open support for Hughes,

while shunning and singling Bell out from her co-workers; Wenzel gave Wal-Mart hats

signifying LP employees to every other employee in the department except Bell; and on one

occasion Bell's supervisors did not offer her the additional hours offered to other employees.

While any of these incidents taken alone would not likely constitute an adverse

employment action, the Court finds that taken together and in the light most favorable to Bell, it

would be reasonable to infer that all these incidents of disparate treatment could have dissuaded

---

[3]The new standard for Title VII retaliation claims outlined in *Burlington Northern* is a
fairly recent decision (June 22, 2006) and was a substantial departure from the test previously
used in the Fifth Circuit, which required plaintiffs to demonstrate an "ultimate employment
action" to satisfy the "adverse employment action" element of a retaliation claim.  As such, the
Court was unable to find any published Fifth Circuit decisions on the applicability of the new
*Burlington Northern* standard.  There are several unpublished decisions, however, and the Court
cites them here as merely illustrative examples, keeping in mind that they are not binding
precedent under Fifth Circuit Rule 47.5.4.  *See, e.g. McCullough v. Kirkham*, 2006 WL 3786043
*3 (unpub. 5th Cir. 2006) (finding a relocation from one desk to another, vague comments by
unnamed employees, and transfers to different divisions as requested by plaintiff to be
insufficient to dissuade a reasonable employee from reporting discrimination); *DeHart v. Baker
Hughes Oilfield Operations, Inc.*, 2007 WL 126081 *3 (unpub. 5th Cir. 2007) (finding one
written warning insufficient to dissuade a reasonable employee from reporting discrimination);
*Pryor v. Wolfe*, 196 Fed.Appx. 260, 263 (unpub. 5th Cir. 2006) (finding that deprivation of
earned compensation constituted an adverse employment action).

a reasonable worker from reporting a charge of discrimination.  Thus Bell has presented a

genuine issue of material fact as to her retaliation claim.  Defendants' motion for summary

judgment on all three plaintiffs' retaliation claims is thereby denied.


**IV.      Conclusion**

For the reasons stated above,

IT IS ORDERED that the defendant's Motion for Summary Judgment is hereby

**DENIED**.

New Orleans, Louisiana this 18th day of March, 2007.


_____
HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE